Youssef H. Hammoud (SBN:321934)
**THE CREDIT ATTORNEY, INC.**
601 N Park Center Suite #202
Santa Ana, CA, 92705
T: 949-301-9692
F: 949-301-9693
E: yhammoud@thecreditattorney.com

*Attorneys for Plaintiff,*
*Randy Hood*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RANDY HOOD<br><br>Plaintiff,<br><br>v.<br><br>TRANS UNION LLC; EQUIFAX INFORMATION SERVICES LLC; EXPERIAN INFORMATION SOLUTIONS, INC.<br><br>Defendants. | Case No.: 8:26-cv-191<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL FOR VIOLATIONS OF:**<br><br>1. FCRA, 15 U.S.C. § 1681 *et seq.*<br>2. CCRAA, Cal. Civ. Code § 1785 *et seq.* |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Randy Hood ("Plaintiff"), through his attorneys, alleges the following against Defendants Trans Union LLC ("Trans Union"), Equifax Information Services LLC ("Equifax"), and Experian Information Solutions, Inc. ("Experian").

## INTRODUCTION

1. Plaintiff, an identity theft victim, brings this action against Defendants for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et. seq.*, and the Consumer Credit Reporting Agencies Act ("CCRAA"), Cal. Civ. Code §1785 *et. seq.*

2. More than twenty million people, just under 10% of all adult Americans, are victims of identity theft each year.[1] Federal Law requires that each consumer reporting agency ("CRA") protect victims by taking steps to remove fraudulent information from victims' reports, to ensure that only third parties with permissible purposes see victims' reports and to implement fraud alerts and security freezes at victims' requests. This lawsuit arises from Defendant's refusal to comply with these statutory requirements and resulting failure to protect Plaintiff from identity theft and identity theft consequences.

3. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

---

[1] Victims of Identity Theft, 2018, 1. U.S. Dept. of Justice, Bureau of Justice Statistics. April 2021, NCJ 256085.

4. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

5. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

6. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

7. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

8. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

9. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [*quoting* 116 cong. Rec. 36570 (1970)] (emphasis added).

10. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the

notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

11. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." See 15 U. S.C. § 1681(a)(4).

12. Plaintiff's claims arise out of the Defendants plainly deficient reinvestigations considering Plaintiff's multiple disputes and repeated notice that he was a victim of identity theft.

13. Accordingly, Plaintiff brings claims against the CRA Defendants, for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i, and for failing to block the identity theft items as disputed and supported by Plaintiff in violation of the FCRA, 15 U.S.C. § 1681c-2.

14. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## JURISDICTION AND VENUE

15. Jurisdiction of the court arises under 28 U.S.C. § 1331 and 15 U.S.C. § 1681.

16. Supplemental jurisdiction of the court arises under 28 U.S.C. § 1367 as the state law claims are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

17. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

18. Defendants transact business here; therefore, personal jurisdiction is established.

## PARTIES

19. Plaintiff is a natural person residing in Newport Beach, California and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

20. Defendant Trans Union is a *credit reporting agency*, as defined in 15 USC 1681a(f)) and is a "person" as defined by 15 U.S.C. § 1681a(b). Defendant Trans Union is regularly engaged in the business of assembling, evaluating, and

disseminating information concerning consumers for the purpose of furnishing *consumer reports*, as defined in 15 USC 1681a(d), to third parties. Transunion's principal place of business is located at 555 West Adamas Street Chicago, IL 60661. TransUnion can be served through its agent for service process, CSC- lawyers incorporating service at 2710 Gateway Oaks Drive Sacramento, CA 95833.

21. The information that Defendant Trans Union collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Defendant Trans Union also collects consumers' personal identifies, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

22. Defendant Experian is a *credit reporting agency*, as defined in 15 USC 1681a(f)) and is a "person" as defined by 15 U.S.C. § 1681a(b). Defendant Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing *consumer reports*, as defined in 15 USC 1681a(d), to third parties. Experian can be served through its agent for service process, C T Corporation System, located at 330 N Brand Blvd, Glendale CA 91203.

23. The information that Defendant Experian collects, maintains, and sells includes confidential details about the income, finances, credit histories, address

histories, application histories, credit review histories, and employment histories of 245 million Americans. Defendant Experian also collects consumers' personal identifies, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

24. Defendant Equifax is a *credit reporting agency*, as defined in 15 USC 1681a(f)) and is a "person" as defined by 15 U.S.C. § 1681a(b). Defendant Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing *consumer reports*, as defined in 15 USC 1681a(d), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street NW, Atlanta, Georgia 30309. Equifax can be served through its agent for service process, Corporation Service Company 2 Sun Court, Suite 400 Peachtree Corners, GA 30092.

25. The information that Defendant Equifax collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Defendant Equifax also collects consumers' personal identifies, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

26. Defendant acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees,

representatives, and insurers.

## BACKGROUND

### Summary of the Fair Credit Reporting Act

27. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

28. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. See 15 U.S.C. § 1681(a).

29. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. See 15 U.S.C. § 1681(b).

30. Congress also recognized that CRAs such as Experian, TransUnion and Equifax "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers." 15 U.S.C. § 1681(a)(3). Therefore, Congress

determined that there "is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

31. For that reason, Congress ensured that the FCRA also provides special protections for victims of identity theft.

32. The first form of protection is the "block." When a consumer identifies any information in their credit file that is the product of identity theft, the CRA must block (delete) the reporting of that information within four business days, provided the consumer submits:

a. Appropriate proof of the identity of the consumer;

b. A copy of an identity theft report;

c. The identification of such information by the consumer; and,

d. A statement by the consumer that the information is not information relating to any transaction by the consumer.

15 U.S.C. § 1681c-2(a).15 U.S.C. § 1681c-2(a).

33. Specifically, upon request of the consumer, a CRA must place an "initial fraud alert" in the file of that consumer and provide that alert along with any credit score generated in using that file, for one year beginning of the date of the request, Unless one year has passed, the CRA can only remove the alert if the consumer

requests removal and the CRA receives "appropriate proof of the identity of the requester." 15 U.S.C. § 1681c-1(a)(1).

34. The third form of protection of the FCRA provides for identity theft victims is a "security freeze," which a consumer can request from nationwide CRAs such as the Defendants here. 15 U.S.C. § 1618c-1(i)(1). Stated otherwise, if a consumer's report is frozen, a CRA will not be able to sell it to creditors assessing credit applications from identity thieves using an affected consumer's identity.

35. A security freeze prohibits a CRA from disclosing the contents of a consumer report that is subject to the freeze to any person requesting the consumer report.

36. Once placed, a security freeze does not expire. A CRA can remove a security freeze only at "the direct request of the consumer," or if it finds that the freeze "was placed due to a material misrepresentation of a fact by the consumer." 15 U.S.C. § 1681c-1(i)(3)(A). Furthermore, when a consumer requests removal, the CRA must first obtain "proper identification" from the consumer before removing the freeze. 15 U.S.C. § 1681c-1(i)(3)(C)

37. The fourth and final form of protection of the FCRA provides for identity theft victims is that even in the absence of a security freeze, a CRA may only release a consumer report to a person "which it has reason to believe… intends to use the information in connection with a. credit transaction involving the consumer on whom

the information is to be furnished…"15 U.S.C. § 1681b(a). When a. Credit transaction is not initiated by the consumer, a CRA may only release the consumer's report with the consumer's authorization or if the user is making a firm offer of credit. 15 U.S.C. § 1681b(c). No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a permissible purpose. 15 U.S.C. § 1681e(a)

38. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct an inaccuracies (15 U.S.C. § 1681i).

39. The FCRA provides consumers with a private right of action against consumer reporting agencies, such as the CRA Defendant's that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**<u>The Credit Bureau Defendants' method for Considering Consumer Credit Report Disputes</u>**

40. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

41. The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

42. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

43. It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

44. Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

45. Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

46. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

47. These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

48. Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

49. The data furnishers then have an obligation under the FCRA to conduct a reasonable investigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

50. Once the data furnisher completes its investigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

## FACTUAL ALLEGATIONS

51. In or around December 2022, Plaintiff learned that an identity thief had opened a Capital One credit card account (the "Account") in his name.

52. Plaintiff submitted multiple disputes directly to Capital One regarding the Account.

53. In or around December 2023, Plaintiff learned that the Capital One account and other information that did not belong to him was reporting on his credit reports.

54. Between January 2024 and November 2025, Plaintiff submitted multiple disputes to Defendants Trans Union, Experian, and Equifax regarding the Capital One Account and the other fraudulent information.

55. Plaintiff's disputes indicated that the Capital One Account did not belong to him and was fraudulently opened in his name.

56. Upon information and belief, Defendant Equifax received Plaintiff's disputes.

57. Upon information and belief, Defendant Trans Union received Plaintiff's

58. Upon information and belief, Defendant Experian received Plaintiff's disputes.

59. Despite Plaintiff's multiple disputes, Defendants Trans Union, Experian and Equifax failed to conduct a reasonable reinvestigation of Plaintiff's disputes and continued to inaccurately report that the Capital One account belonged to him.

60. On at least one occasion, Plaintiff submitted a police report and/or FTC identity theft report to the Defendant credit reporting agencies to support his claims.

61. Despite this, the Defendant credit reporting agencies continued to report the Capital One account as past due with a balance owed on Plaintiff's respective credit reports.

62. In addition to the inaccurate reporting of the Capital One account, Plaintiff disputed other items of information in his credit reports that did not belong to him, including an address in Hacienda Heights that was used to open the Capital One account.

63. Plaintiff has never before lived in Hacienda Heights, and despite his repeated disputes, the Defendant credit reporting agencies refused to correct the inaccurate information.

64. Plaintiff did exactly what she should have done upon realizing she was the victim of identity theft.

65. Plaintiff disputed directly with the Defendant credit reporting agencies and explained that the Capital One account and other information were fraudulently opened and that he was the victim of identity theft.

66. Plaintiff filed a police report and FTC identity theft report.

67. Plaintiff immediately identified himself as an identity theft victim and requested that CRA Defendants block the account information that was the product of identity theft.

68. The Credit Bureau Defendants failed to permanently block the fraudulent accounts that was the product of identity theft despite Plaintiff's multiple disputes.

69. The Credit Bureau Defendants repeatedly disregarded Plaintiff's credible disputes. Often responding to a victim of identity theft that the furnisher of the account that was the product of identity theft had verified the account as accurate.

70. The Credit Bureau Defendants understand that it is often the case that an identity thief's activities, often designed intentionally to fabricate information into a credit file, will cause false information to appear on an identity theft victim's credit file.

71. As a direct result of Defendant Experian's ardent refusal to block the fraudulent information, which was a product of identity theft, Defendant Experian has continued to saddle Plaintiff with an open credit account that was the product of identity theft.

72. As a direct result of Defendant Trans Union's ardent refusal to block the fraudulent information, which was a product of identity theft, Defendant Trans Union has continued to saddle Plaintiff with an open credit account that was the product of identity theft.

73. As a direct result of Defendant Equifax's ardent refusal to block the fraudulent information, which was a product of identity theft, Defendant Equifax has

continued to saddle Plaintiff with an open credit account that was the product of identity theft.

74. Due to Defendants' ardent refusals to comply with their respective obligations pursuant to the FCRA and CCRAA, Plaintiff was forced to file a lawsuit.

75. Further, Plaintiff expended countless hours disputing the same with the Credit Bureau Defendants, repeatedly, to no avail.

76. Defendants' conduct disrupted Plaintiff's life and impacted his plans.

77. It has taken Plaintiff an incredible amount of time to document the events, secure his credit, and track down supporting documents, all of which affected his ability to spend time working and move forward with his life.

78. Defendants' conduct has caused Plaintiff extreme and ongoing stress and anxiety. Plaintiff has suffered from sleepless nights, frustration, worry, and ultimately felt utterly hopeless that Defendants would ever properly reinvestigate his disputes.

79. In addition, Plaintiff is handicapped and suffer from severe cervical stenosis. The stress of this issue has significantly worsened his medical condition, resulting in daily migraines, anxiety, and an increased reliance on sleep and prescription pain medications.

80. At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of

their agency or employment, and under the direct supervision and control of the Defendants herein.

81. At all times pertinent hereto, the conduct of Defendants, as well as that of their representative agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent, and in utter disregard for federal law and the rights of Plaintiff herein.

82. The Credit Bureau Defendants have a long history of disregarding the credit reporting rights of identity theft victims under the FCRA and CCRAA. For example, in the very similar matter of *April Hendrix v. Equifax, et. al.* (N.CM.D. C.A. No. 1-16-cv-201), an identity theft victim sued the Credit Bureau Defendants, over their repeated wrongful removal of security freezes, release of her credit reports for impermissible purposes, and refusal to properly reinvestigate disputed identity theft information on her credit reports.

83. The *Hendrix* suit put the Credit Bureau Defendants on notice several years ago that their respective policies and procedures for implementing security freezes and handling identity theft victims' requests and disputes were woefully inadequate.

84. The Credit Bureau Defendants have had years of notice in the form of federal lawsuits, despite it all, the Credit Bureau Defendants did not take any better steps to protect the Plaintiff here.

85. The respective internal policies and procedures of the Credit Bureau Defendants do not appear to place any value on its obligations under the FCRA and/or CCRAA to report credit entries accurately, to reinvestigate carefully when notified of consumer disputes, and to avoid giving third parties access to consumers' reports without authorization or permissible purpose. Nor do the Credit Bureau Defendants' respective policies and procedures respect their statutory duties to enforce or at minimum add security freezes and fraud alerts as requested by the consumer.

86. As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the data furnishers despite numerous court decisions admonishing this practice. See Cushman v. Trans Union Corp., 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); Apodaca v. Discover Fin. Servs., 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); Gorman v. Experian Info. Sols., Inc., 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

87. The Credit Bureau Defendants are aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA and/or CCRAA to lower their costs. Accordingly, the Credit Bureau Defendants' violations of the FCRA and/or CCRAA are willful.

88. The Credit Bureau Defendants' policies and procedures clearly establish willfulness, wantonness, and utter and reckless disregard for the rights and interests of consumers and led directly to the injuries of Plaintiff as described in this complaint.

89. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove an open and derogatory credit accounts that were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove an open and derogatory loan account that was the product of identity theft.

90. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including without limitation, emotional and mental anguish and pain, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is questioned and disbelieved by the Defendants.

**COUNT I**
**ALL DEFENDANTS**
**(Violations of the FCRA, 15 U.S.C. § 1681 *et seq*.)**

91. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

92. The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

93. Congress enacted the FCRA to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

94. The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

95. The FCRA requires credit reporting agencies, like Trans Union, Equifax and Experian to “follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.” 15 U.S.C. § 1681e(b).

96. Defendants negligently and/or willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of information pertaining to debts.

97. Consequently, Defendants routinely report inaccurate, and materially misleading information about Plaintiff, without verifying the accuracy of this information, or updating this information as required by § 1681(e)(b) when Defendants possess information inconsistent with the reported information and possess information establishing that the reported information is in fact inaccurate.

98. Defendants knew or should have known of their obligations under the FCRA, especially pertaining to discharged debts. These obligations are well established by the plain language of the FCRA, in promulgations of the Federal Trade Commission, well-established case law, and in prior cases involving Defendant from which Defendant is on notice of their unreasonable procedures.

99. Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681(e)(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning the Plaintiff.

100. Even after Plaintiff notified Defendants Equifax, Experian and Trans Union of the inaccurate information, the credit reporting agencies continued to inaccurately report the Capital One account.

101. When a consumer disputes the accuracy or completion of information included in a CRA's credit file, the FCRA requires the agency to either conduct a reasonable reinvestigation into the disputed information **or** delete the disputed information from the consumer's credit file within thirty (30) days of receiving notice of the dispute. 15 U.S.C. § 1681i(a)(2)(A).

102. When conducting its reinvestigation of disputed information in a consumer report, the credit reporting agency is required to "review and consider all relevant information submitted by the consumer."

103. Additionally, the CRA must notify the person who furnished the disputed information of the consumer's dispute within five business days of its receipt. When notifying the furnisher of the consumer's dispute, the CRA is to "include all relevant information regarding the dispute that the agency received from the consumer." 15 U.S.C. § 1681i(a)(2)(A).

104. Defendants Experian, Equifax and Trans Unions' violations of 15 U.S.C. § 1681i include, but are not limited to the following:

a. Failing to reasonably reinvestigate the inaccurate information Plaintiff disputed.

b. Failing to consider all relevant information while investigating Plaintiff's dispute.

c. Failing to include all relevant information when notifying Capital One of Plaintiff's dispute.

105. Instead of reasonably reinvestigating Plaintiff's dispute, Defendants Trans Union, Experian and Equifax "verified" the Capital One account were accurate and continued to report the accounts with a past due balance and a collection status.

106. Defendant's acts, as described above, were done willfully and knowingly.

107. Alternatively, Defendants were negligent, entitling Plaintiff to recover damages pursuant to 15 U.S.C. § 1681o.

108. Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from Plaintiff's credit report.

109. Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit file or correct the inaccurate information upon reinvestigation.

110. As a result of Defendants' Equifax, Experian, and Trans Union's violations of 15 U.S.C. § 1681, Plaintiff suffered actual damages which have been further described above.

111. In addition, Defendants' Equifax, Experian, and Trans Union violated 15 U.S.C. 1681c-2(a) by failing to block the reporting of the Capital One account information in Plaintiff's file that the Plaintiff identified as information that resulted from identity theft.

112. Defendants Equifax, Experian, and Trans Union had no reasonable basis to decline to block, or rescind any block, of the fraudulent information relating to Plaintiff.

113. Defendants Equifax, Experian, and Trans Union's violations were willful, rendering each Defendant individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

114. In the alternative, Defendants Equifax, Experian, and Trans Union were negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

115. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § § 1681n and 1681o.

## Count VI
## ALL DEFENDANTS
## (Violations of the Consumer Credit Reporting Agencies Act, Cal. Civ. Code § 1785 *et seq.*)

116. Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

117. The Credit Bureau Defendants violated the CCRAA. The Credit Bureau Defendants violations include, but are not limited to, the following:

118. Defendant Experian violated Cal. Civ. Code § 1788.14(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff when preparing a consumer credit report.

119. Defendant Trans Union violated Cal. Civ. Code § 1788.14(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff when preparing a consumer credit report.

120. Defendant Equifax violated Cal. Civ. Code § 1788.14(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff when preparing a consumer credit report.

121. The Credit Bureau Defendants violated Cal. Civ. Code § 1785.16 et. seq., including but not limited to, by:

a. failing to reinvestigate the disputed information;

b. failing to review and consider all relevant information submitted by Plaintiff with respect to the disputed information.

122. The Credit Bureau Defendants acts, as described above, were done willfully and knowingly.

123. Consequently, the Credit Bureau Defendants are liable to Plaintiff for actual damages, punitive damages, and attorneys' fees and costs pursuant to Cal. Civ. Code § 1785.31.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Randy Hood respectfully requests that judgment be entered against Defendants for the following:

A. Declaratory judgment that Defendants violated the CCRAA;

B. Actual damages against Defendants pursuant to CCRAA, Cal. Civ. Code § 1785.31(a)(1) and Cal. Civ. Code § 1785.31(a)(2)(A);

C. Punitive damages of $5,000.00 per violation against Defendants pursuant to CCRAA, Cal. Civ. Code § 1785.31(a)(2)(B);

D. Costs and attorney's fees against Defendants pursuant to CCRAA, Cal. Civ. Code § 1785.31(a)(1);

E. Declaratory judgment that Defendants violated the FCRA;

F. Actual damages against Defendants pursuant to the FCRA, 15 U.S.C. § 1681n(a) and 15 U.S.C. § 1681o(a)(1);

G. Statutory damages against Defendants pursuant to FCRA, 15 U.S.C. § 1681n(a)(1)(A);

H. Punitive damages against Defendants pursuant to FCRA, 15 U.S.C. § 1681n(a)(2);

I. Costs and attorney's fees against Defendants pursuant to FCRA, 15 U.S.C. § 1681o(a)(2);

J. Punitive damages to be determined at trial, for the sake of example and punishing Defendants for their malicious conduct, pursuant to Cal. Civ. Code § 3294(a);

K. Awarding Plaintiff any pre-judgment and post judgment interest as may be allowed under the law; and

L. Any other relief that this Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

RESPECTFULLY SUBMITTED,

Dated: January 26, 2026

*/s/ Youssef H. Hammoud*
Youssef H. Hammoud (SBN:321934)
**THE CREDIT ATTORNEY, INC.**
601 N Park Center Suite #202
Santa Ana, CA, 92705
T: 949-301-9692
F: 949-301-9693
E: yhammoud@thecreditattorney.com

*Attorneys for Plaintiff,*
*Randy Hood*